IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION

| | | |
|---|---|---|
| Ben E. Harris | § | CIVIL ACTION NO. 3:22-cv-178 |
| | § | |
| vs. | § | |
| | § | |
| Ascend Performance Materials, TX, Inc. | § | JURY REQUESTED |

## PLAINTIFF'S FIRST AMENDED ORIGINAL PETITION

COMES NOW, Plaintiff Ben E. Harris and files this his First Amended Original Petition complaining of Defendant Ascend Performance Materials Texas Inc, and will show the court the following:

## I. JURISDICTION AND VENUE

1.  Discovery should be conducted under Level 2 of the Texas Rules of Civil Procedure. Claimant(s) seek monetary relief over $100,000 but not more than $1,000,000, including damages of any kind, penalties, costs, expenses, pre-judgment interest, and attorneys fees.

2.  This Court has jurisdiction over Plaintiff's state and federal claims, under 28 U.S.C. § 1331, 29 U.S.C. § 623 *et seq*., and supplemental jurisdiction under 28 U.S.C. § 1367(a) to hear Plaintiff's state law claims.

3.  Venue is proper in this Court under 28 U.S.C. § 1391 (b-d) because the incidents at issue took place in Brazoria County, Texas, and alternatively, Defendant has a corporate presence in Harris County, Texas, both within the United States Southern District of Texas.

## II. PARTIES

4.  Plaintiff, Ben E. Harris, is a resident of Brazoria County, Texas. His Social Security number is XXX-XX-X039. His drivers' license number is XXXXX208.

5.  Defendant Ascend Performance Materials Texas, Inc. ("Ascend") is a for-profit foreign limited liability company, believed to be incorporated in Saint Louis, Missouri. Defendant Ascend

Performance Materials Texas, Inc. is a foreign company doing business in the state of Texas with significant ties to the state, including corporate offices in Houston, Texas, located at 1010 Travis Street, Suite 900, Houston, Texas, 77002, and 600 Travis Street, Suite 300, Houston, Texas 77002. Defendant Ascend Performance Materials Texas, Inc. has been served, although it has not answered herein.

6.      At all times material to this suit, Defendant Ascend was the employer of the Plaintiff.

### III. STATEMENT OF FACTS

7.      Ascend Performance Materials Texas, Inc. is an international chemical production firm with locations in Belgium, Shanghai, five other locations within the United States, and corporate locations in Houston, Texas. Ascend Performance Materials Texas, Inc. is owned by SK Capital Partners. Cyanco Holding Corporation is a Nevada-based corporation that built and owns the Sodium Cyanide (NaCN) unit within Ascend's "Chocolate Bayou" Alvin, Texas location. Cyanco is owned by Oak Tree Capital.

8.       Although Cyanco owns the unit, Ascend operates, maintains, and staffs the unit with Ascend employees and personnel. The purpose of the NaCN unit is to produce briquettes of hazardous sodium cyanide to be sold to chemical companies that require readily accessible cyanide catalysts for their respective chemical processes, such as the refining of gold.

5.       Plaintiff began working on the facilities that became the current plant in June, 1978. He was initially employed by Mundy Company, who contracted with Monsanto to rebuild a barge dock. In July he was transferred to a turnaround on the "AN" Unit, which produces the supply stock for the sodium cyanide unit. He became the back-up foreman within six months, and was promoted to Foreman a year later. He was hired by Monsanto to work in the AN unit

2

as a Processor in 1991. At the end of 1993 he was made a Unit Specialist in charge of the AN unit.

6.  In 2003, Monsanto spun off the AN unit to Solutia Chemicals. In June 2008, he was moved to the ECU unit as a "Specialist". In 2011 he was promoted to Shift Lead.

7.  The NaCN unit was under construction in early 2012, and began production in late 2012. Plaintiff was one of the workers who was instrumental in the construction and start-up of the unit. Because of his experience in the AN unit, which supplies raw materials for the NaCN unit, and his work in the ECU unit, which provides maintenance and utilities for the whole of the plant, he was uniquely qualified for the NaCN Unit. He began as a Shift Lead.

8.  The NaCN unit was created to produce solid briquettes of sodium cyanide, but as an unwanted side effect, it also produces vast amounts of highly volatile free floating sodium cyanide dust that permeates the air within the unit and saturates the machinery and unit workers employed by Ascend. The quantity of the dust build up is such that purchasing companies have complained to Ascend about the volume of hazardous cyanide dust on the plastic packaging around the briquettes, and have requested that the shipments be cleaned by Ascend employees prior to shipment.

9.  Disturbingly, appropriate "PPE" or personal protective equipment has not been issued to the men who work the bagging and loading areas within this production facility, despite requests by Ascend personnel as far back as 2012. Sodium Cyanide is activated by water. Even the moisture of human sweat or exposed mucus membranes (such as eyes, mouth, nose) will result in activation of the caustic chemical resulting in chemical burns on the skin and degradation of the nervous system. While sodium cyanide disperses and is metabolized quickly

3

within the blood stream, long term exposure is evident in kidney and liver degradation, loss of lung capacity, and severe thyroid and nervous system damage.

10.       Mr. Harris has been working at the plant since 1978, and an employee of Ascend since 1991. Mr. Harris' annual reviews have been excellent, including 2012 - 2021 (Shift Lead). Mr. Harris has received a service award, general acclaim, and celebrated over 30 years with the company.

11.       In 2017, in an accident at home, Mr. Harris severely injured his back. Although he did not miss work time because of the injury, his employers knew of the back condition. His job as Shift Lead did not require strenuous physical activity. Typical duties of the Shift Lead included walking the unit and inspecting its operation, supervising employees and giving them direction, holding daily meetings, attending any meetings with representatives of the company, and planning operations. Mr. Harris continued to get excellent reviews, and performed his job loyally and well. The back injury required him to get injections for pain management in 2018, and 2019.

12.       In 2020, Ascend hired several employees, including management members, from Celanese. These persons were unfamiliar with the overall plant. Mr. Harris was intimately familiar with the plant having built it, started it, and worked at several different units in the plant. In April of 2020, Ascend attempted to reduce its personnel by offering early retirement packages to older employees. This indicates a negative attitude on the part of Ascend about the value of older and more experienced employees.  Mr. Harris was offered such a package. He declined. In December 2020, a person from the HR department, asked Mr. Harris when he was retiring. The question was not appropriate for the conversation. This was another indication that Mr. Harris' age would be considered a reason to get rid of him.

4

13.      On or about February 14, 2021, there was a state wide polar vortex causing freezing conditions, a loss of power, and great hardship. The Ascend NaCN plant was shut down for approximately a month. In the efforts to re-start the plant, equipment was started, tested, and then put into duty. Mr. Harris was the supervisor for the evening shift in March 2021. The day shift operator turned over the plant to Mr. Harris with a briefing of the status of the startup. Mr. Harris was advised that the crystallizer would be started as soon as the primary pump was tested, but only to the stage of adding water. Mr. Harris was advised to not add caustic until the next day because the Engineers wanted to witness the addition of the chemicals. Mr. Harris, although a Supervisor, made the extra effort to walk the plant and check for leaks outside due to concerns about freeze damage. He found some leaks that were repaired in order for the Unit to be ready to add caustic the next morning. In the morning, he passed on to the incoming shift that the crystallizer was ready for caustic. Although he was available throughout the shift by radio, and otherwise, he received no reports of any problem.

14.      On April 20, 2021, Mr. Harris was called in to a meeting to discuss what had happened with the start up. Mr. Harris did not have any indication that he would be the focus of the discussion. It was his belief that the Board Operator of the night shift did not pull up the plans for the start-up, which were available both online and in hard copy. The job description for Board Operator clearly states that it was his obligation to pull the plans. However, Mr. Harris was accused of a lack of leadership because "the start-up procedure was not followed." He was demoted with a cut in pay to the MHBA unit.

15.      However, there was no start-up procedure in place at the time of the turn over of the plant to the day Shift Lead. Mr. Harris had been instructed that the unit should wait on the Engineers. The purported reason for demotion, "lost faith in your ability to lead and manage a

5

team", was a pretext. The actual reason that Mr. Harris was demoted was to attempt to force him out of the workplace by humiliation. Although humiliated, Mr. Harris made the decision to tough it out, because his retirement was imminent.

16.    At the time, April 2021, there was a Shift Lead position open in the NaCN unit. Ascend's disciplinary process, if it had been followed, would have qualified Mr. Harris for that position, which he had held previously. Instead, he was demoted to Processor in the MHBA unit, and a younger man was given the Lead Shift position in the NaCN unit. The Processor job began with heavy manual labor, loading trucks and rail cars. The Processor job would normally have then shifted to training for less strenuous work. However, he was not provided the training. When he asked about the training, the response from his supervisor was a question. His supervisor asked when he would be retiring. When Mr. Harris replied that he wasn't considering retiring until after July 2022, the Supervisor replied the he would keep Mr. Harris in loading jobs. Both the Unit Manager and the Shift Lead told Mr. Harris separately that they would not train him as a Processor because he would be leaving soon.

17.    The true reason that Ascend targeted Mr. Harris was that he was rapidly eligible for retirement due to his age and tenure. He is over 60 years old. Refusing him opportunities due to his age and tenure was discriminatory retaliation.

18.    Mr. Harris was assigned to perform manual labor unsuited to his education, expertise, experience, and physical abilities. In August 2021, his back was suffering to the degree that he asked his Pain Management team if he could obtain another back injection. The injection was approved and given in September 2021. However, where in prior years the injections lasted a year to 14 months, the injection rapidly was insufficient to allow him to tolerate his back pain. He had a fourth injection in October or November 2021, mere months after the third injection.

When that was not able to provide relief within two weeks, Mr. Harris returned to his neurosurgeon. The neurosurgeon ordered new MRIs of the back. Those MRIs revealed that the heavy manual labor had caused an aggravation injury to Mr. Harris' back. He now needed surgery, which he had been able to avoid for many years.

19.    The back surgery could not be performed immediately. Mr. Harris was prescribed hydrocodone for the chronic back pain resulting from his aggravation injury. Mr. Harris duly reported this to his employer. The Plant Nurse would not allow him to work while taking hydrocodone. He was placed in short-term disability status. His access to his online accounts at Ascend was cut. Thus, he was not allowed to look for job openings at the plant that would be more suitable for his experience, expertise, and physical limitations.

20.    Although the aggravation injury to his back should have been reported to the Texas Workers' Compensation system by the Employer, Ascend, upon information and belief it was not properly reported. Ascend had actual knowledge of the injury that occurred on the job, caused by unsuitable assignment to manual labor, through the Plant Nurse's knowledge, and the Supervisors' of Plaintiff actual knowledge. The back surgery was performed on June 9, 2022.

IV.

**DISCRIMINATORY DEMOTION PURSUANT TO
AGE DISCRIMINATION IN EMPLOYMENT ACT 29 U.S.C. §623** *et seq.*
**& CAT'S PAW THEORY**

**Exhaustion of Administrative Remedies:**

**Charge of Discrimination filed: August 19, 2021**

**Right to Sue granted: April 7, 2022**

**This suit filed: May 3, 2022.**

21.      Mr. Harris is a member of a protected class, over the age of 40. He is older than men working in either the Shift Lead, Shift Supervisor, or manual labor positions. With his tenure, he has a better than average knowledge of the processes needed to restart the NaCN plant. He was falsely accused of endangering the plant and other workers, when there was no caustic in the system that could have injured either the plant or other workers. He was falsely accused of failing to obtain a standard procedure, when the obligation to pull the procedure was in the job description of the Board Operator, and not in the Lead Shift. A motivating factor was Mr. Harris' age and tenure resulting from age, with his impending retirement.

22.      Ascend has written guidelines for discipline of employees. The "Guide to Corrective Action", HR200, has a scaled approach for perceived inadequacies of the performance of employees. Ascend did not follow its own guidelines when it demoted Mr. Harris. In material part the guidelines direct that "No employee will be discharged for poor work performance without prior warning that his/her performance is unsatisfactory and his/her job is at risk…". Mr. Harris was not given a prior warning that his performance was unsatisfactory.  In further material part the guidelines direct that "The progressive approach for improving performance should be used in most cases. Supervisors should work in conjunction with Human Resources to modify the process to reflect mitigating circumstances or the employee's relevant work history." Mr. Harris' tenure, expertise, and the lack of immediate danger to the plant or others, were not considered in the determination to demote Mr. Harris. The Board Operator, a younger man, whose failure it was to refer to available plans, received a lesser discipline.


**V.**
**Violations of Section 451.001, et seq, of the Texas Labor Code.**

23.      The conduct of Defendant Ascend as alleged above, is further in violation of the Texas

8

Workers' Compensation Retaliation Statute, Texas Labor Code 451.001, et seq, which states, in

pertinent part:

> **§    451.001.    Discrimination    Against    Employees    Prohibited**
> A person may not discharge or in any other manner discriminate against an employee
> because the employee has:
> (1) filed a workers' compensation claim in good faith;
> (2) hired a lawyer to represent the employee in a claim;
> (3) instituted or caused to be instituted in good faith a proceeding under Subtitle A; or
> (4) testified or is about to testify in a proceeding under Subtitle A.

24,    There is no administrative procedures that is required to be exhausted prior to filing such a

claim. Alternatively, all procedures prior to filing suit have been performed or have occurred.

25.    Mr. Harris had a chronic back condition which required regular medical care. When

Ascend made the decision to demote Mr. Harris to manual labor, it knew, or in a reasonable

exercise of care should have known, that he would be injured by that labor. Mr. Harris has

sustained an aggravation injury to his back due to the manual labor to which he was assigned.

26.    A motivating factor in the demotion of Plaintiff was that he incurred an aggravation injury

that should have been OSHA reportable, as a on-the-job injury that should have been reported as

a workers compensation claim. Defendant Ascend seeks to maintain its highly solicited rating with

OSHA. Truthful reporting of the conditions, injuries, and falsifications of reports will jeopardize

this coveted rating. However, failing to truthfully record injuries such as those sustained by

Plaintiff, subjects the injured workers to loss of benefits, including promotion opportunities, cost

of medical care, and other lost benefits.

27.    Defendant's retaliatory conduct included the pitifully inadequate or entirely absent

investigation into Plaintiff's aggravation injury, the disregard of Plaintiff, plaintiff's co-workers,

and plaintiff's doctors' statements, disregarding Ascend's own policies for reporting and handling

workers compensation claims, disregarding Ascend's own policies for staffing and promotion,

disregarding OSHA and TWC requirements for reporting claims, and failing to promote Plaintiff who was clearly better qualified that the other candidates for promotion. This is an ongoing and pervasive, hostile atmosphere, which originated in 2020 and continues to the present. The current hostility to Mr. Harris' chronic condition and re-injury is a further and additional incident demonstrating this pervasive retaliation.

**VI.**
**DAMAGES**

28.     As a direct and proximate result of the above complained of conduct, Plaintiff has been denied the chance to advance his career and obtain benefits that he was eligible for in his position as Shift Supervisor, along with according pay and bonus options. Plaintiff has further been subjected to a hostile work environment, and discrimination and retaliation because of his age, as well as his re-injury.

LOST EARNING, FUTURE LOST EARNINGS AND SPECIAL DAMAGES

29.     At the time of the incident and conduct complained of herein, Ben Harris was gainfully employed by Defendant. As a direct and proximate result of the wrongful acts, practices and omissions as alleged herein, Ben Harris demoted and thereby suffered a loss of income for which he sues.

30.     As a result of the wrongful acts, practices and omissions as alleged herein, Ben Harris' earnings (including annual bonuses), retirement benefits, and capacity to earn a livelihood were severely impaired. Ascend provides health insurance, life insurance, vision insurance, dental insurance, similar insurance for his wife, tax deferred savings, 401(k) savings, and additional benefits that can be used for mental health treatment. The additional cost of attempting to procure similar benefits as an individual through the marketplace is prohibitive.

31.     In all reasonably probability, Ben Harris's loss of earnings and loss of earnings capacity will continue long into the future, if not for the balance of Ben Harris's natural life.

32.     Ben Harris thus seeks lost earnings in the form of back pay, lost wages, front pay, retirement benefits, fringe benefits, lost future earnings and/or diminished earnings capacity, and such other and further pecuniary losses to which he may show himself entitled.

PAST AND FUTURE MENTAL ANGUISH

33.     As a direct and proximate result of the wrongful acts, practices and omissions as alleged herein, Ben Harris has suffered physical injury, sickness, and/or illness as well as severe emotional and mental pain and anguish, grief, humiliation, embarrassment, and anxiety. Ben Harris has suffered feeling of anxiety, worthlessness, embarrassment and inferiority. Ben Harris has further suffered ill effects including, but not limited to depression, anxiety restlessness, disruption of his daily schedule, sleeplessness, and loss of self-esteem due to the wrongful acts, practices and omissions as alleged herein. In all reasonable probability, Ben Harris will continue to suffer such severe mental and physical anguish for a long time in the future, if not for the balance of his natural life.

COSTS OF MEDICAL CARE

34,     As a direct and proximate result of the wrongful action, practices and omissions as alleged here, Ben Harris has suffered physical injury that required medical care. Mr. Harris seeks reimbursement for the past and future costs of medical care, disfigurement, disability, and lack of earning capacity.

ATTORNEYS FEES

35.     Ben Harris is entitled to recover attorneys' fees in a sum that is reasonable because suit was necessary to address the wrongful acts, practices and omissions as alleged herein, and recover

his losses. Ben Harris has retained the undersigned attorneys to assist him in the prosecution of his claims.

36,    Further, Ben Harris seeks an upward adjustment or enhancement to the "lodestar" amount of attorneys fees to be determined in the prosecution of this suit. A reasonable attorneys' fee is further requested for the work expended in the preparation and trial of this cause along with a reasonable fee for any appeals.

37.    Further, Ben Harris seeks recovery for the reasonable and necessary costs of suit, the use of associate attorneys, paralegals, and/or law clerks who participate in the prosecution of this suit. As permitted, Ben Harris seeks to re-coup all litigation expenses expended in the prosecution of this cause.

EXEMPLARY DAMAGES

38.    The conduct of Defendant, as further alleged herein, was carried out and constituted such an entire want of care as to constitute conscious indifference to the rights and welfare of Ben Harris. Because of the intent held by Defendant, and its agents, servants, officers, and employees, toward Ben Harris, Defendant has acted in a reckless or willful and intentional manner, and committed the acts and omission complained of, which were calculated to cause injury, suffering and damage to Ben Harris.

39.    Accordingly, Defendant acted with malice, actual malice and/or specific intent to injure Ben Harris. Ben Harris is entitled to recover exemplary or punitive damages to deter such cruel, discriminatory, and undignified treatment in the future. Accordingly, Ben Harris request that punitive damages be awarded against Defendant in an amount that the jury determines is just.

VII.
JURY DEMAND

40.   Ben Harris demands his right to trial by jury. Ben Harris requests that this case be set for trial at the earliest possible convenience of the court.

WHEREFORE, PREMISES CONSIDERED, Plaintiff respectfully prays that the Defendant be cited and made to appear, and that upon trial on the merits, that Plaintiff be awarded his losses, and all such other remedies, in law or in equity, to which he may show himself entitled.

Respectfully Submitted,

_/s/ Savannah Robinson___
Savannah Robinson
ATTORNEY IN CHARGE
FOR PLAINTIFF
SBN: 17108150
Fed. ID: 5922
1822 Main Street
Danbury, Texas 77534
Phone: (979)922-8825
savannahrobinson@aol.com

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true, complete and correct copy of the attached and foregoing was this day served by certified mail, return receipt requested, pursuant to the Federal Rules of Civil Procedure, on the following persons, on this the __24___ day of __June_____, 2022.

Rachel Steely, Taylor Appling, Foley & Lardner, 1000 Louisiana St., Suite 2000, Houston, TX  77002-5007; FAX: 713-276-5555; rsteely@foley.com, tappling@foley.com

_/s/*Savannah Robinson*_____
Savannah Robinson